ROBERT L. GRAFF, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
GRAFF v. COMMISSIONER
Docket Nos. 6763-84, 17785-84.
United States Tax Court
T.C. Memo 1986-550; 1986 Tax Ct. Memo LEXIS 57; 52 T.C.M. (CCH) 1025; T.C.M. (RIA) 86550; November 17, 1986; As Amended December 23, 1986 David Roth and Harvey D. Tack, for the petitioner. Roger Glienke, for the respondent. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: By notices of deficiency dated February 21, 1984, and May 31, 1984, respondent determined deficiencies in and additions to petitioner's income tax as follows: Additions to Tax
Year
Deficiency
Sec. 6653(b)(1) [1]
Sec. 6653(b)(2)
Sec. 6654
1982
$852,057
$426,029
*
$78,809
Sec. 6653(a)(1)
Sec. 6653(a)(2)
Sec. 6654
1983
$850,643
$42,532
*
$52,054
Respondent subsequently determined, in the alternative, that petitioner is subject to the following additions to tax: Additions to Tax
Year
Sec. 6651(a)(1)
Sec. 6653(a)(1)
Sec. 6653(a)(2)
1982
$213,014
$42,603
*
*59 Sec. 6653(b)(1)
Sec. 6653(b)(2)
1983
$425,322
*
After concessions, the issues are: (1) Whether, in each of the years in issue, petitioner received unreported gross income of $1,714,608 from sales of a controlled substance; and (2) whether petitioner is liable for the addition to tax for fraud imposed by section 6653(b)(1) and (2). Petitioner concedes that, if this Court determines that he realized any income in the years in issue, he is subject to the additions to tax imposed by section 6651, 6653(a), and 6654. FINDINGS OF FACT Some of the facts have been stipulated, and the facts set forth in the stipulation are incorporated in our findings by this reference. Robert L. Graff (petitioner) resided in Canoga Park, California, when his petitions were filed. Petitioner worked as an insurance broker and attended numerous college level courses in business and taxation. He filed Federal income tax returns for all years prior to 1981 in which he had gross income. During 1982 and 1983, petitioner was well aware of his obligation to file income tax returns, but he nevertheless *60 failed to file returns for either year. He did not maintain books or records of his income producing activities. (The facts in the foregoing paragraph were all stipulated by petitioner.) In 1982 and 1983, Georges Vartanian (Vartanian) and his partners managed and offered for rent a 14 unit industrial building located on Cozycroft Avenue in Chatsworth, California (the Cozycroft location). In January 1982, one of Vartanian's partners told him that a person identifying himself as "Bob Graff" was interested in renting Unit J of the Cozycroft location. Vartanian met two persons at Unit J. The prospective tenants told Vartanian that their business, called "G & B Sales Co.," refurbished and resold equipment. On February 1, 1982, Vartanian and the person identifying himself as "Bob Graff" executed a lease for Unit J. "Bob Graff's" address, according to the lease, was the post office box set forth on petitioner's then current driver's license. Petitioner maintained this post office box in 1982 and 1983. Petitioner and another person thereafter took possession of the premises that were the subject of the lease. Petitioner was the person entering into the lease as "Bob Graff." *61 William Sovia (Sovia) opened a woodworking business at Unit H of the Cozycroft location in March 1982. Within a month or two he became aware that Unit J was occupied. He saw petitioner on the premises. He observed that the tenants of Unit J usually were not present during normal working hours but were present late in the evening; they did not interact with other tenants. Sovia occasionally heard the loud, repetitive sound of machinery coming from Unit J. In May 1982, petitioner rented a truck that was used to pick up 300 pounds of anthranilic acid from an establishment known as the Chemical Shed. Anthranilic acid is an ingredient used in the manufacture of methaqualone. Methaqualone, commonly known by the street names of quaaludes, ludes, or tablet, was a substance controlled by the State of California pursuant to its Health and Safety Code. Petitioner dealt extensively in cash. In 1983 he made the following cash purchases: Amount
Purchase
$ 50,000.00
Cessna aircraft
1,152.00
Aircraft repairs
8,352.63
Aircraft service
10,136.82
Radar unit
2,924.91
Navigation transceiver
5,000.00
Personal computer
3,793.84
Trip to Hawaii
25,000.00
Downpayment for all
shares of "4422, Inc."
$106,360.20
*62 With respect to the Cessna aircraft, petitioner signed an Aircraft Bill of Sale, an Aircraft Registration Application, and an Application for Aircraft Radio Station Licence; each document indicated that the purchaser/applicant was a nominee in Eagle Point, Oregon. In March 1983, Detective Roy B. Wunderlich (Wunderlich) of the Los Angeles Police Department (LAPD) investigated a strong odor of ether that had been detected in Canoga Park. Wunderlich had investigated several dozen clandestine methaqualone laboratories and had participated in the seizure of five such laboratories. He had also been involved in three undercover sales of anthranilic acid to persons illegally manufacturing methaqualone, and on approximately 20 occasions had observed containers of anthranilic acid at the Chemical Shed. The ether, a substance which is commonly used in the clandestine manufacture of illegal drugs, was emanating from petitioner's residence. As of November 17, 1983, Wunderlich had set up surveillance on petitioner's residence, and on November 18, 1983, he observed a person, later identified as George A. Govednik (Govednik), arrive at petitioner's residence in a yellow Cadillac. Govednik, *63 a fugitive, had been indicted by the State of North Carolina on two counts of Conspiracy to Traffic in a Controlled Substance (Methaqualone). The LAPD maintained surveillance of petitioner and Govednik from November 17 to December 5, 1983 and observed them together at several locations, including the Cozycroft location. On December 5, 1983, LAPD detectives arrested petitioner and Govednik shortly after they left the Cozycroft location. The LAPD recovered approximately $5,000 in cash from petitioner's person and $3,295 in cash from Govednik's person. The detectives also seized a briefcase bearing the initials "R.G." from petitioner's automobile. The briefcase contained cocaine, marijuana, a fully loaded automatic handgun and several large, white single scored tablets of methaqualone bearing the imprint "Lemmon 714." Two shotguns were recovered from the trunk of petitioner's automobile. The detectives recovered a key to Unit J of the Cozycroft location from petitioner. Upon search of the premises, they discovered a fully operational clandestine methaqualone laboratory. The laboratory was well established and had been in operation for at least one year. A sophisticated pill *64 press was equipped with dies capable of punching out quaalude tablets marked with the inscription "Lemmon 714." The repetitive mechanical sound of the press was loud enough to be heard outside the laboratory. Petitioner's fingerprints were found on several items of equipment at laboratory. The detectives seized 249.75 pounds of methaqualone product from Unit J of the Cozycroft location. The laboratory contained 72.5 pounds of finished quaalude tablets and 177.25 pounds of goods-in-process. The goods-in-process consisted of white methaqualone powder found in the mixer and grinder and drying solid yellow methaqualone found on drying boards. Richard Bingle (Bingle), Chief Forensic Chemist for the City of Los Angeles, the officer in charge of the LAPD's Hazardous Chemical Team, was responsible for the identification and documentation of all physical evidence seized at the Cozycroft location. He had previously participated in the investigation of three clandestine methaqualone laboratories. He completed a property report shortly after the seizure of the laboratory. The report states that the LAPD detectives found many items commonly used in the manufacture of methaqualone, including *65 a large quantity of "cut" or "extender," and 14 empty cardboard drums. Although Bingle's report estimates that each drum had once contained 50 pounds of anthranilic acid, the standard container of this type contains 100 pounds of anthranilic acid. On December 3, 1984, petitioner and Govednik pled guilty to charges of manufacture of methaqualone, possession for sale of methaqualone, and possession of cocaine. Petitioner was sentenced to a term of 3 years imprisonment, and a stay of execution was granted pending his appeal of the conviction. Govednik was sentenced to a term of 2 years. He was returned to North Carolina where he was incarcerated for a term of approximately 14 years. LAPD detectives contacted William Evans (Evans), an Internal Revenue Service agent, shortly after they arrested petitioner and Govednik. Wunderlich advised Evens of petitioner's arrest and provided Evens with copies of his reports. Evans and Wunderlich's supervisor discussed the LAPD investigation of petitioner's activities. The LAPD advised Evens that it had recovered 15 empty drums that had each at one time contained at least 100 pounds of anthranilic acid. On the basis of this information, Evans *66 determined that 680,400 grams of methaqualone had been manufactured. Evans determined that the police had seized 45,360 grams (100 pounds) of methaqualone, assumed that the missing 635,040 grams of methaqualone had been processed into quaalude tablets and, advised by the LAPD that approximately 4 tablets could be produced from one gram of "cut" methaqualone, determined that 2,540,160 quaalude tablets had been manufactured and sold. Wunderlich advised Evens that the "normal going rate" for quaaludes was at that time between $3.00 and $5.00 per tablet. LAPD detectives had recently participated in an undercover wholesale buy of 100,000 quaalude tablets in which a price of $4.50 per tablet had been charged. The wholesale price of a quaalude tablet was approximately $2.00 to $3.00 in 1982 and 1983. On the basis of information provided to him by the LAPD, Evans determined that the laboratory had been in existence from February 1982 to early December 1983. Evans computed petitioner's gross and taxable income as follows: Grams of methaqualone manufactured (1500# X 453.6)
$ 680,400 Less: Amount seized by police (100# X 453.6)
( 45,360)
Goods available for sale - in grams
635,040 Number of tablets, per gram
X 4 Tablets sold
2,540,160 Estimated price per tablet (wholesale)
X $3 Gross sales
$7,620,480 Less: Cost of Goods Sold (Estimate 10%)
( 762,048)
Net profit from operation
$6,858,432 Less: Portion to partner (Estimate 50%)
(3,429,216)
Total income to taxpayer
$3,429,216 Gross income by period (Twenty-two months of
activity divided into eleven months for each
1/1/83 - period, or
1982
12/6/83  $3,429,216/22 X 11)
$1,714,608 $1,714,608 Less: Personal Exemptions
( 4,000)
( 4,000)
Taxable Income
$1,710,608 $1,710,608 *67 On December 20, 1983, respondent made a jeopardy assessment against petitioner for 1982 income tax in the amount of $852,057, together with additions to tax in the total amount of $504,838 and interest in the amount of $75,997, for a total assessment of $1,432,892. Respondent terminated petitioner's 1983 taxable year on December 20, 1983, and, pursuant to section 6851(a), assessed tax in the amount of $850,643 for the period beginning on January 1, 1983 and ending on December 5, 1983. Respondent sent or delivered to petitioner two letters, entitled Notice of Jeopardy Assessment and Right of Appeal, and Notice of Termination Assessment, respectively. The Notice of Termination Assessment stated that the assessment did not relieve petitioner of his obligation to file a return for the complete taxable year. A schedule of respondent's computation of the respective assessments was attached to each letter. Although additions to tax for civil fraud (section 6653(b)) and failure to pay estimated tax (section 6654) were set forth in the computation schedule and were assessed for the taxable year 1982, no additions to tax were so determined or assessed for the terminated period beginning *68 January 1, 1983 and ending December 5, 1983. On February 21, 1984, respondent mailed a statutory notice of deficiency to the petitioner for the 1982 taxable year, determining an income tax deficiency and additions to tax in the same amounts as previously assessed for that year. Respondent did not determine additions to tax or interest for 1983 until May 31, 1984, when respondent sent petitioner the notice of deficiency for the full calendar year 1983. The notice determined a deficiency in the amount of $850,643 and also determined the additions to tax for negligence imposed by section 6653(a)(1) and (2) and the additions to tax for failure to pay estimated tax imposed by section 6654. Petitioner timely filed his petition on or about June 11, 1984, and respondent filed his answer on or about August 10, 1984. Respondent's answer contained affirmative allegations that asserted, for the first time, that petitioner was subject to the additions to tax imposed by section 6653(b)(1) and (2) for 1983. ULTIMATE FINDINGS OF FACT In 1982 and 1983, petitioner received taxable income from the manufacture and sale of methaqualone. Petitioner underpaid his taxes for 1983 with the intent to *69 evade taxes known to be owing. OPINION Respondent maintains that petitioner received unreported gross income from the manufacture and sale of methaqualone tablets in 1982 and 1983 and that petitioner is liable for the civil fraud additions to tax imposed by section 6653(b). Petitioner contends that respondent has offered no substantive evidence supporting either his determination of deficiency for 1982 or the imposition of additions to tax pursuant to section 6653(b) for either 1982 or 1983.Petitioner also contends that respondent's determination of petitioner's 1983 income tax liability does not reflect the evidence presented at trial. Petitioner argues in his post-trial brief that certain of respondent's proposed findings of fact are based in part on hearsay evidence. Petitioner did not object to this evidence at trial. [2] Objections raised for the first time in petitioner's brief are not timely and are deemed waived. United States v. Fernandez,772 F.2d 495, 503 (9th Cir. 1985); Fuller v. Commissioner,20 T.C. 308, 314 (1953), affd. 213 F.2d 102 (10th Cir. 1954). Moreover, evidence is not hearsay when offered, not for the *70 truth of the matter asserted, but to establish that respondent did not act arbitrarily in determining the deficiency. Avery v. Commissioner,574 F.2d 467, 468 (9th Cir. 1978), affg. a Memorandum Opinion of this Court. See Rule 801(c), Federal Rules of Evidence. The items in question are used solely for nonhearsay purposes in reaching our decision. The Deficiencies
1. Respondent's burden
A presumption of correctness ordinarily attaches to the Commissioner's *71 determination of a deficiency. Welch v. Helvering,290 U.S. 111 (1933). This presumption is a procedural device that requires the taxpayer to go forward with enough evidence to support a finding contrary to the Commissioner's determination. Rockwell v. Commissioner,512 F.2d 882, 885 (9th Cir. 1975), affg. a Memorandum Opinion of this Court; see Federal Rules of Evidence 301. In general, the taxpayer also bears the burden of proof. Rule 142(a), Tax Court Rules of Practice and Procedure. This is a burden of persuasion that requires the taxpayer to demonstrate the merits of his claim by at least a preponderance of the evidence. Rockwell v. Commissioner,supra.In cases of unreported illegal income, however, a special rule has been developed. The Court of Appeals for the Ninth Circuit, to which the case is appealable, has stated that "there must be some evidentiary foundation linking the taxpayer to the alleged income producing activity * * * where * * * the government asserts that the taxpayer was engaged in an activity which is otherwise illegal." Weimerskirch v. Commissioner,596 F.2d 358, 362 (9th Cir. 1979), *72 revg. 67 T.C. 672 (1977). In this case, we are bound by Weimerskirch. See Golsen v. Commissioner,54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971). In Weimerskirch, the court emphasized the utter lack of any evidence "linking" or "connecting" the taxpayer with the illegal activities. 596 F.2d at 361-362. The Commissioner had based his computation of the taxpayer's illegal income from heroin sales on the statements of confidential informants and other inadmissible evidence. The court refused to sustain the Commissioner's determination, relying heavily on the Supreme Court's discussion in United States v. Janis,428 U.S. 433 (1976), of the scope of the exclusionary rule in civil tax cases. The Supreme Court stated that without the illegally seized evidence there in issue, the Commissioner's determination would be "a 'naked' assessment without any foundation whatsoever" (emphasis in original), and that "an assessment * * * utterly without foundation * * * is arbitrary and erroneous." 428 U.S. at 441-442. In Weimerskirch, the Commissioner did not produce any admissible *73 evidence "linking" or "connecting" the taxpayer to the sale of heroin. In Adamson v. Commissioner,745 F.2d 541, 547 (9th Cir. 1984), affg. a Memorandum Opinion of this Court, the taxpayer had been arrested in possession of large amounts of cash and illegal drugs. The court held that the Commissioner had presented "clear evidence linking * * * [the taxpayer] to the sale of drugs and receipt of unreported income." In Rapp v. Commissioner,774 F.2d 932, 935 (9th Cir. 1985), and Edwards v. Commissioner,680 F.2d 1268, 1270 (9th Cir. 1982), the court also explicitly held that the Commissioner's determinations must be supported by "some substantive evidence" demonstrating that "the taxpayer received unreported income." 774 F.2d at 935; 680 F.2d at 1270, citing Weimerskirch v. Commissioner,596 F.2d at 360. See also Tokarski v. Commissioner,87 T.C. 74, 76 (1986). Respondent has presented circumstantial evidence strongly suggesting that petitioner manufactured and sold methaqualone in 1982 as well as in 1983. Compelling evidence links petitioner to the manufacture and sale *74 of methaqualone in 1983. LAPD detectives uncovered a sophisticated clandestine methaqualone laboratory. Petitioner's fingerprints were on several items of equipment, and a key to the laboratory was in his pocket. Petitioner and Govednik were arrested shortly after they left the laboratory. Each carried large quantities of cash. Petitioner admits that the made several very large cash purchases in 1983, totaling not less than $106,360.20. Petitioner pled guilty to charges of possession of methaqualone with intent to distribute. Taken as a whole the evidence also shows that petitioner established a laboratory in the earlier year. Although the landlord did not recognize petitioner at trial in December 1985, we are convinced that petitioner was the person who leased the Cozycroft location in February 1982. Petitioner was seen entering and leaving the laboratory. He rented a truck that was used, with his knowledge, to obtain 300 pounds of anthranilic acid in 1982. The quantities manufactured in such an operation cannot have been intended for personal consumption, and the only reasonable explanation is that drugs were manufactured for sale. See Adamson v. Commissioner,745 F.2d at 547 n.2. *75 Although the laboratory discovered in 1983, as discussed below, was technically complex, we cannot believe that petitioner needed 10 months to establish his operations before he began selling drugs. Petitioner does not explain how he met any of his expenses in that year. Respondent's determination that petitioner was engaged in income-producing activities in 1982 was not unreasonable. Petitioner has not explained any of the circumstantial but highly incriminating evidence. His direct testimony, constituting approximately one page of the trial transcript, consists of an admission that he rented the truck in 1982 and a general denial of any involvement in sales of methaqualone. He did not attempt to explain his activities at the Cozycroft location. The following colloquy occurred: THE COURT: Mr. Graff, do you deny that you rented these premises? THE WITNESS: Your Honor, I did not rent those premises, personally. I was not involved in that rental agreement at all. My name is on it, but I did not rent that premise. THE COURT: Did you keep any books and records of your insurance business? THE WITNESS: Yes, I do. THE COURT: How much did you make from the insurance business *76 in 1982? THE WITNESS: Your Honor, I don't -- don't actually know at this point in time because of the fact that the records were all torn up when the detectives served their search warrant on my office at 17071 Ventura Boulevard. THE COURT: How did you end up with so many -- so much cash in relation to those airplane transactions? The WITNESS: Not all of that money was mine, obviously. THE COURT: Well, it's not obvious to me. THE WITNESS: Well, your Honor, it wasn't mine. Not all mine. Now, part of it was mine. THE COURT: Where did you get the part that was yours? THE WITNESS: I gamble a little bit. THE COURT: Why didn't you file tax returns during 1982 and '83? THE WITNESS: Total negligence. I know that's a poor word to use, and they should have been filed. THE COURT: Why did you plead guilty to possession of controlled substances for sale? THE WITNESS: Because of the fact * * * it was part of a plea bargain, so that the, uh, the search warrant and so forth could be appealed to the Appellate Court. THE COURT: Well, the guilty plea -- assuming the Appellate Court doesn't reverse on the search warrant is going to be a conviction. THE WITNESS: That is correct, *77 Your Honor. We do not believe petitioner's denials. See Avery v. Commissioner,574 F.2d at 468. 2. Respondent's computation of petitioner's income.
Respondent may use any reasonable means to compute petitioner's unreported income; especially in cases where, as here, the taxpayer has failed to file returns or to keep adequate records and the unreported income is derived from an illegal enterprise. United States v. Johnson,319 U.S. 503, 517-518 (1943); Jackson v. Commissioner,73 T.C. 394, 403 (1979); section 446(b); section 1.446-1 (b)(1), Income Tax Regs. The absence of tax records cannot automatically deprive respondent of a rational foundation for his determination of deficiency. Bradford v. Commissioner,796 F.2d 303 (9th Cir. 1986), affg. a Memorandum Opinion of this Court. Petitioner failed to keep adequate records in either of the years in issue. He should not be "overly chagrined at * * * [our] reluctance to credit every word of his negative wails." See Webb v. Commissioner,394 F.2d 366, 373 (5th Cir. 1968), affg. a Memorandum Opinion of this Court. Petitioner contends *78 that respondent's determination of deficiencies is erroneous. After a careful analysis of the record, we are convinced that, at least in some respects, he is correct. Petitioner maintains that a more accurate computation of his income must asume that the LAPD detectives seized 14 empty anthranilic acid drums at the Cozycroft location and that each of these drums had once contained 50 pounds of anthranilic acid. Petitioner also contends that respondent should have allowed an additional 149.75 pounds of methaqualone and methaqualone products in his computation as part of the "less: amount seized by police" figure. Finally, petitioner argues that respondent should have assumed that the average wholesale price of a quaalude tablet was $2.50, not $3.00. Petitioner does not dispute any of the other assumptions that respondent incorporated in his computation. Maintaining that respondent did not produce evidence sufficient to establish illegal drug activity in 1982, petitioner argues that respondent's computation should be modified as follows: Grams of methaqualone manufactured (700# X 456.3)
$ 317,520 Less: Amount seized by police (250# X 453.6)
(113,400)
Goods available for sale - in grams
204,120 Number of tablets, per gram
X 4 Tablets sold
816,480 Estimated price per tablet (wholesale average)
$ 2.50 Gross sales
$2,041,200 Less: Cost of Goods Sold (Estimate 10%)
(204,120)
Net profit from operation
$1,837,080 Less: Portion to partner (Estimate 50%)
(918,540)
Total income to taxpayer in 1983
$ 918,540 *79 Although respondent's computation assumed that the LAPD detectives seized 15 empty anthranilic acid drums at the Cozycroft location, the contemporaneously prepared property report shows that 14 empty drums were found. Wunderlich testified that this type of container generally contains from 100 to 300 pounds of anthranilic acid powder and that the "standard" container of this type contains 100 pounds of acid. On this issue, Wunderlich's testimony was persuasive. Bingle's property reports are the only evidence which suggest that the empty containers once contained less than 100 pounds of anthranilic acid. He admitted at trial, however, that his determination of the quantity of anthranilic acid that had once been in each container was simply a "guess" of the container's "size." Wunderlich's estimate, based on his much greater experience with clandestine methaqualone laboratories, is more persuasive. We conclude that 14 empty drums were seized at the Cozycroft location, and that each drum once held 100 pounds of anthranilic acid. Respondent concedes that the LAPD detectives seized 249.75 pounds of methaqualone product at the Cozycroft location, or 149.75 pounds more than the amount *80 allowed in respondent's computation. Respondent contends that no adjustment of the computation is warranted because (1) the anthranilic acid containers found at the Cozycroft location each may have held up to 300 pounds of that chemical, (2) the substantial amount of "cut" or "extender" found at petitioner's clandestine laboratory suggests that the 4 to 1 tablet/gram of methaqualone ratio assumed by respondent was too conservative, and (3) additional empty anthranilic acid containers may have been disposed of by petitioner prior to December 5, 1983. These arguments are unpersuasive. Although mathematical exactitude is not required, respondent should accurately apply the figures he has selected for his determination.When an assumption proves incorrect, he should appropriately adjust his computation. Petitioner also contends that respondent erroneously determined that the wholesale price of a quaalude tablet was $3.00 in each taxable year. Detective Wunderlich testified that in 1983 the wholesale price of quaalude tablets was $2.00 to $3.00 per tablet, that it might have been a little less in 1982, and that in each of the taxable years it might have been a little more, depending *81 on a number of factors. This testimony, unsatisfactory as it may be, was the only admissible evidence of quaalude prices offered at trial. Respondent is under no obligation to assume the lowest price supported by the evidence. In the absence of persuasive evidence to the contrary, we cannot find that respondent's determination was unreasonable. Petitioner's income thus must be recomputed as follows: Grams of methaqualone manufactured (1,400 X
453.6)
$ 635,040.00 Less: Amount seized by police (249.75 X 453.6)
(113,286.60)
Goods available for sale, in grams
521,753.40 Number of tablets per gram
X 4 Tablets sold
2,087,013.60 Price per gram
X 3.00 Gross sales
6,261,040.80 Less: Cost of Goods Sold (Estimate 10%)
(626,104.08)
Net profit
5,634,936.72 Less: Portion to partner (Estimate 50%)
(2,817,468.36)
Gross income
2,817,468.36 Gross income by period (twenty-two months of
activity divided into eleven months for
period)
1/1/83 -  1982
12/6/83    $1,408,734.18 $1,408,734.18 Less: Personal Exemptions
( 4,000.00)
( 4,000.00)
Taxable Income
$1,404,734.18 $1,404,734.18 *82 Fraud
To sustain additions to tax under section 6653(b), respondent must prove, by clear and convincing evidence, that petitioner underpaid his taxes for each year and that any such underpayment was due to fraud. Section 7454(a); Rule 142(e), Tax Court Rules of Practice and Procedure.Respondent's burden is met if it is shown that petitioner intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968); Webb v. Commissioner,394 F.2d 366 (5th Cir. 1968), affg. a Memorandum Opinion of this Court; Rowlee v. Commissioner,80 T.C. 1111, 1123 (1983). The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Rowlee v. Commissioner,80 T.C. at 1123; Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud will never be presumed. Rowlee v. Commissioner,80 T.C. at 1123; Beaver v. Commissioner,55 T.C. 85, 92 (1970). *83 Fraud may be proven by circumstantial evidence because direct proof of the taxpayer's intent is rarely available. Bradford v. Commissioner,supra;Rowlee v. Commissioner,80 T.C. at 1123. The taxpayer's entire course of conduct may establish the requisite fraudulent intent. Rowlee v. Commissioner,supra;Stone v. Commissioner,56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner,53 T.C. 96, 105-106 (1969). The Court of Appeals for the Ninth Circuit has recently set forth a nonexclusive list of the "badges of fraud" that circumstantially demonstrate fraudulent intent. These "badges of fraud" include: (1) understatement of income, (2) inadequate records, (3) failure to file tax returns, (4) implausible or inconsistent explanations of behavior, (5) concealment of assets, and (6) failure to cooperate with tax authorities. Bradford v. Commissioner,supra.The following additional facts support a finding of fraud: (1) engaging in illegal activities, (2) attempting to conceal those activities, (3) dealing in cash, and (4) failing to make estimated tax payments. Bradford v. Commissioner,supra. *84 Most of these "badges of fraud" and other facts tending to prove fraudulent intent are present in this case. The evidence shows that petitioner substantially understated his income in 1983.Petitioner admitted that he failed to maintain adequate records of his income producing activities or to file a return for that taxable year. Petitioner attempted to conceal his ownership of the aircraft he purchased in 1983 by registering it in the name of a third party residing in another state. Petitioner made cash purchases in 1983 totaling at least $106,360, and he was arrested with $5,000 in cash on his person. He pled guilty to charges of illegally manufacturing quaalude tablets in 1983. Finally, he failed to make estimated tax payments for 1983. Petitioner maintains that respondent's 1983 termination assessment relieved petitioner of his obligation to file a 1983 return and that respondent has therefore offered no evidence of fraudulent acts occurring after respondent's termination assessment. Petitioner ignores respondent's Notice of Termination Assessment, which clearly identified petitioner's continuing obligation to file a return for 1983. [3] The suggestion that petitioner *85 believed that he had no obligation to file a return for 1983 is contrary to his stipulation that he knew of his filing obligations and his testimony quoted above. With respect that year, respondent's determination of the additions to tax imposed by section 6653(b) will be sustained. With respect to 1982, we have concluded as explained above that there *86 is sufficient evidence linking petitioner to an income-producing activity to show that respondent's determination is reasonable and not without rational foundation. That evidence does not, however, satisfy respondent's burden of proving by clear and convincing evidence that petitioner underpaid his taxes in 1982. There is no evidence of actual receipts by petitioner in that year. The inference of receipt of income drawn from petitioner's connection to the laboratory and material for the manufacture of drugs is not sufficient to prove that petitioner owed taxes for that year, even though the circumstances would otherwise support a finding of fraudulent intent. Petitioner concedes that he is liable for the additions to tax imposed by section 6654. Petitioner also concedes all other issues raised in his petition. We have considered additional arguments of the parties and find that they are without merit. To reflect the foregoing, Decisions will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue. 50 percent of interest on $850,643
*↩ 50 percent of interest on $852,057
*. 50 percent of interest on $852,057↩
*. 50 percent of interest on $850,643↩
2. Petitioner represented himself at trial. He is represented on brief by counsel. His original counsel withdrew a year before trial, citing petitioner's failure to cooperate in preparing this case. Petitioner moved for a continuance to obtain new counsel at the time of calendar call 1 week before trial and 6 months after service of the notice of trial and this Court's Standing Pre-Trial Order. His untimely motion was denied. See Rule 134, Tax Court Rules of Practice and Procedure↩, which expressly states that employment of new counsel is not a ground for continuance and that a motion for continuance filed within 30 days of trial ordinarily will be denied.
3. Section 1.6851-1(a)(3), Income Tax Regs., explicitly provides: (3) Taxable year not affected by termination.↩ Notwithstanding any termination assessment a taxpayer shall file a return in accordance with section 6012 and the regulations thereunder for the taxpayer's full taxable year. The term "full taxable year" means the taxpayer's usual annual accounting period determined without regard to any action under section 6851 and this section. The return shall show all items of gross income, deductions, and credits for such taxable year. Any tax collected as a result of a termination assessment will be applied against the tax due for the taxpayer's full taxable year. Except as provided in sec. 1.6851-2 (relating to departing aliens), no return is required to be filed for a terminated period other than a full taxable year.